## THE STATE v. MARTHA P. AITKEN and CHARLES AITKEN, Appellants.

### Division Two, February 27, 1912.

1. **EVIDENCE: Statement by Conspirator: After Consummation of Crime.** A statement made by one conspirator concerning the connection of his co-conspirator with the crime, made after its consummation, is competent as to him, and if no objection is made as to its competency as to his co-conspirator, the two being tried jointly, and no request is made that it be limited to the conspirator making it, its admission cannot be reviewed on the appeal of the co-conspirator.

2. **INSTRUCTION: Two Defendants: Punishment of Each.** An instruction telling the jury that if they find certain facts to exist they will "find the defendants, or either of them, guilty . . . and will assess the punishment of each of them at imprisonment . . . You may find both of the defendants guilty, or you may find one of them guilty and the other not guilty, or you may find both of them not guilty," where the jury found both guilty, and separately assessed the same punishment against each, is not misleading. It could not have been understood to tell the jury to assess a punishment against both if either were found guilty.

3. **————: Motive: Present: No Instruction: Requested by Defendant.** Motive is a material consideration in a case of circumstantial evidence, but though there is uncontradicted evidence showing motive, it does not follow that the court is compelled to instruct on motive. If no instruction on motive is given for the State, it is not reversible error to refuse defendant's instruction on the subject.

Appeal from Jefferson Circuit Court.—*Hon. E. M. Dearing*, Judge.

Affirmed.

*John T. Fitzsimmons* for appellants.

(1) The evidence wholly fails to connect the defendants with the act of abortion, if any were committed, resulting in the death of Lilby Anna Aitken. There is an entire absence of those facts which, in

cases of this kind, usually establish by circumstantial
evidence the guilt of the accused. On the contrary,
the State's case abounds in facts which circumstan-
tially point to the innocence and the consciousness of
innocence of the defendants. In the light of all past
cases wherein the court has passed on the question
of the sufficiency of the circumstantial evidence to
sustain the verdict, the Supreme Court should grant
relief to these defendants. Even those cases where-
in the point was ruled against the defendants would
alone be sufficient authorities in behalf of the defend-
ants in this case. The fact that there are two defend-
ants jointly convicted makes the circumstances against
them much weaker in probative value. State v. Burg-
dorf, 53 Mo. 67; State v. Mansfield, 41 Mo. 470; State
v. Jaeger, 66 Mo. 173; State v. Castor, 93 Mo. 253;
State v. Primm, 98 Mo. 368; State v. Packwood, 26 Mo.
340; State v. Daubert, 42 Mo. 239; State v. Brosius,
39 Mo. 534; State v. Musick, 71 Mo. 401; State v.
Warner, 74 Mo. 83; State v. Hammond, 77 Mo. 159;
State v. Lowe, 93 Mo. 574; State v. McNamara, 100
Mo. 100; State v. Edmondson, 131 Mo. 348; State v.
Finley, 193 Mo. 202; State v. Gow, 235 Mo. 307; State
v. Faulkner, 175 Mo. 546.    State v. Scott, 177 Mo.
665; State v. Heusack, 189 Mo. 295; State v. Francis,
199 Mo. 694; State v. Morney, 196 Mo. 43; Comer v.
Railroad, 181 Mo. 397; State v. Casto, 231 Mo. 398.
There is no evidence, direct or circumstantial, indicat-
ing that the defendants or either of them had in their
possession or used upon Lilby Anna Aitken "any in-
strument or hard substance," as predicated in the
main instruction. Instructions must be based upon
evidence and not upon mere conjecture. Marr v. Bun-
ker, 92 Mo. 651; McAtee v. Valandingham, 75 Mo. App.
45; Moore v. Streigel, 50 Mo. App. 308; Holden v.
Railroad, 177 Mo. 456; State v. Bonner, 178 Mo. 424;
State v. Hicks, 178 Mo. 433; Kennedy v. Railroad,
128 Mo. App. 297; Felver v. Railroad, 216 Mo. 210.

(3)  The instruction given by the court on circumstantial evidence is an abstract statement of the law as far as it goes. Instructions of this kind are always dangerous unless full and complete in their statement of the law. The court erred more particularly in giving its instruction on circumstantial evidence because it omitted reference to the absence of motive for the crime charged for which the defendants asked by their refused instruction on circumstantial evidence. State v. Bauerle, 145 Mo. 1; State v. Foley, 144 Mo. 600; State v. Faulkner, 175 Mo. 546; State v. Scott, 177 Mo. 665; Comer v. Railroad, 181 Mo. 397; State v. Heusack, 189 Mo. 295; State v. Francis, 199 Mo. 694; State v. Morney, 196 Mo. 43.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Assistant Attorney-General, for the State.

(1)  The instructions, numbered 1, 2, 3 and 4, given on the part of the State, are full, fair and clearly present the law of the case to the jury. The court very properly refused instruction number 1, requested by appellants, as State instruction number 2 covered the same phase of the case. State v. Brooks, 220 Mo. 74. (2)  Appellants assign error in their motion for a new trial in that the court failed to instruct on all the law of the case. Appellants failed to object and save an exception to the failure of the court to instruct on all the law of the case, and, therefore, that question is not before this court for review. State v. Tucker, 232 Mo. 15. (3)  There was an abundance of substantial evidence to support the verdict of guilty as returned by the jury in this cause. The court very properly overruled appellants' demurrer offered at the close of the State's testimony. State v. Scott, 214 Mo. 261; State v. Espenschied, 212 Mo. 223.   (4)  State's instruction number 1 is a substantial copy of the instruction as approved in State v. Fitzporter, 93 Mo. 393, and makes

plain to the jury that they might convict or acquit either or both the appellants as they thought justified under the evidence. In said instruction this language is used: "You will find the defendants, or either of them, guilty of manslaughter in the second degree." That part of the instruction which reads "and will assess the punishment of each of them at imprisonment in the penitentiary for a term of not less than three nor more than five years," could only have led the jury to believe that they were to assess such punishment against each defendant, in case the jury found each defendant guilty. Any other construction placed upon said section would be an unreasonable construction, and entirely ignoring that part of the instruction above quoted, which plainly told the jury that they might convict one of the defendants and acquit the other, or convict both, or acquit both, as they saw fit. The jury returned separate verdicts in this cause, thereby disclosing that they considered the guilt of each appellant separately.

FERRISS, P. J.—Appeal of defendants, convicted in the circuit court of Jefferson county of manslaughter by producing an abortion upon Lilby Anna Aitken, wife of defendant Charles Aitken, and sentenced to three years in the penitentiary.

The testimony for the State tended to prove the following facts:

Lilby Anna Blake was eighteen years old on April 18, 1911, and married Charles Aitken, defendant, on May 7, 1911. The Blake and Aitken families lived in the town of DeSoto, and for about one month prior to her said marriage Lilby Anna Blake had been living at the house of defendant Martha P. Aitken and her son, Charles. After the marriage, Charles Aitken and his wife lived with Mrs. Blake, mother of deceased. Soon after the marriage deceased told her mother,

sister and some neighbor friends that she was then pregnant, and had been so for about two weeks prior to her marriage.

On Monday, prior to Sunday, June 25, 1911, the date of Mrs. Aitken's death, defendant Charles Aitken left the Blake home, early in the morning. Some time during that morning he met a sister of deceased on the streets in DeSoto, and sent word by her to his wife to come up to his mother's house, which she did that afternoon. This departure by Aitken and his wife appears to have been without any prearrangement. The wife took none of her belongings from her mother's house. A few days before their leaving Mrs. Blake's, defendant Aitken brought his wife some "tansy tea" which had been prepared and sent by his mother for the purpose, as she afterwards claimed, of relieving a menstrual trouble from which, she said, deceased was reported by the husband to be suffering. He also took some medicine in a bottle to his wife at about the same time. From the time of the departure of Aitken and his wife, on Monday, neither Mrs. Blake nor any of her family heard anything from her daughter until the following Sunday afternoon, at about two o'clock, when Aitken came to Mrs. Blake's, and said: "You had better come and see her. She is awful bad. She is in bed, and is awful bad." When Mrs. Blake reached the Aitken home she found her daughter in a rear room, the doors and windows of which were closed. She was then unconscious, and died within an hour. Defendant Mrs. Aitken told Mrs. Blake that she had given deceased some tansy tea, some ginger tea and a morphine tablet during the night. Mrs. Blake noticed some blood spots on the bed where deceased was lying.

On Sunday morning, at about one o'clock, Dr. Donnell, a practicing physician, was called by the husband to see deceased. The doctor found her with a pulse of 114, with a subnormal temperature, uncon-

scious, and in a collapsed condition, with death upon her. Defendants told Dr. Donnell that she had been sick for several days, and had been unconscious since eight o'clock Saturday night. On this phase of the case Dr. Donnell testified as follows:

"I remarked that she seemed to be rather stupid, and Mrs. Aitken said, 'I gave her an eighth of a grain of morphine this evening,' and I asked her when, and she said, about eight o'clock, and I said, 'What for?' and she says, 'She was always suffering a great deal of pain with her monthly period.' She says, 'She came up here last month, or Charley came up, and talked to me about it, and says, "Mother, for God's sake, do something for Anna, as she is having such pain." And I didn't know what to do, and I made him a bucket of tansy tea and sent it down to her, and she got up and came up here on Tuesday, and was feeling bad, and so we gave her some tansy tea and some ginger tea, and, in fact, I did everything that I knew to relieve her.' And I asked her if any flow had come on, and she said, 'No, none at all.' And I proceeded to examine her, and reached down and felt of her abdomen, and it was very sore to the touch, and she would cry out at the very touch of my hand; and I noticed when I first pulled the sheet down that there was some blood on it, and, from all the appearances of her abdomen, she had peritonitis, which is an inflammation of the lining of the abdominal cavity and covering of the bowels. Mrs. Aitken says: 'I have been using hot applications over the stomach, as I thought it was some ovarian trouble.' She said she expected there was some ovarian trouble there; and I turned the sheet back, and noticed several smears of blood where she was lying on the sheet."

Mrs. Highfield, a near neighbor of the defendants, and who went to the Aitken home a few minutes after the death of the deceased, testified as follows:

"After I got there, I went in and looked at her; and that was about all I could do. We went up there, and I says to Mrs. Aitken: 'Was there anything the matter with the girl?' and she says, 'No.' I says to Mrs. Aitken: 'Was she pregnant with a child?' and Mrs. Aitken says, 'O, no; she wasn't that way; nothing like that wrong with her.' Mrs. Aitken said she was having some trouble with her monthlies, and that she had given her some tansy tea, and that Charley had given her some ginger tea, and she had given her a tablet. And when I got there and saw her, she looked purple all over. I looked at her myself, and I spoke to some of the others about it."

This witness further testified that she observed blood spots on the bed, and that the folded pad under deceased was quite bloody; that Mrs. Aitken again made the statement that deceased had been sick since she came there, on Monday, and that she did not become dangerously ill until Saturday night prior to her death.

Deceased was buried on Thursday following the date of her death, and her body was exhumed on July 10th, and an autopsy held on July 11th. The autopsy was conducted by Doctors Hensly, Donnell and Stegman, all of whom testified that they found all of the organs normal except the womb, which was about five and a half inches in length, and in a soft, flabby condition; that the womb contained about an ounce of thick blood, and that the neck thereof was torn, as though there had been some hard substance pushed through. The neck of the womb was also raw from effect of the passing in of some hard substance. In the top of the womb were found three holes which had been formed by some sort of an instrument about the size of an ordinary lead pencil. All three physicians testified that, in their opinion, deceased was pregnant some eight or nine weeks prior to her death, and that

she died of peritonitis caused by the holes punched into her womb, and the abortion resulting therefrom.

John Albers testified that on the day on which the autopsy was held he said to defendant Charles Aitken: "Charlie, this is a pretty tough case;" to which Aitken replied: "I don't know. It looks like it couldn't hurt me as I know of; and if they can do anything at all, they might stick mother."

The proof also discloses that "tansy tea" will produce an abortion, and that it is used for that purpose as well as to promote menstruation. It further appears that during the week, from Monday until Sunday noon, none of the neighbors saw deceased at the Aitken home.

There was some testimony from near neighbors that moans were heard, apparently from the Aitken home, on Sunday morning, and that at the same time a graphophone was playing from the same house.

The defendant, Martha Aitken, is a midwife of long practice. Defendant Charles Aitken was heard to say, both before and after his marriage, that his wife should never have any children. The testimony is that deceased was in perfect health up to the time she went to the Aitken home, on Monday preceding her death, except that she was pregnant, and suffered the ills incident to that condition. No physician was called until the morning of the day she died, and when she was past human aid.

Defendant Charles Aitken testified that he did not make the statement attributed to him by John Albers. Further than this he did not testify; nor did his co-defendant take the stand.

I. It is earnestly urged that the peremptory instruction should have been given at the close of the testimony, and that there is no substantial evidence to support the verdict.

After careful consideration of the evidence, we think that, although purely circumstantial, the evidence is sufficient to take the case to the jury. The deceased was pregnant. An abortion was committed. No one had access to her except the defendants. Therefore, it is reasonable to conclude that the abortion was the act of the defendants, or of one of them, or that it was the act of deceased. It was possible for deceased to have produced this abortion by using, herself, some hard substance to puncture the womb; but the probabilities are that she did not do it. The defendants are mother and son, and naturally working in sympathy. Motive appears in the remarks of the husband that his wife should have no children, and in the fact that she was pregnant prior to her marriage. The acts of the defendants, as testified to, are inconsistent with innocence. The giving of the medicines adapted to produce miscarriage; the sudden call to the deceased to go to the Aitken house; the concealment by defendants of her illness until death was impending, although they claimed that she had been sick the entire week; the failure to call a physician until death was at hand; the denial by the woman that the girl was pregnant, and the assertion that she was suffering from imperfect menstruation, when she must have known that the facts were otherwise, are things which do not comport with innocence. Furthermore, the condition of the womb negatives the idea that the girl herself inflicted the injury. She might have made the punctures which were found, but it would seem impossible for her to have produced by herself the injuries found at the neck of the womb, which both doctors say had been found open and torn by the passage of some hard substance.

We are asked to reject the statement which defendant Charles Aitken made, to the effect that it might go hard with his mother, on the ground that she would not be bound by any statement by a co-conspira-

tor after the consummation of the conspiracy. The statement was competent as to defendant Charles Aitken. No objection was made on behalf of Mrs. Aitken, nor any instruction asked limiting this statement as evidence against Charles only. Therefore, we cannot review the matter. This is a court of errors. No error was committed by the trial court in this regard.

II.   Instruction numbered 1 given by the court is as follows:

"The court instructs the jury that the defendants, by the information in this case, stand charged with manslaughter in the second degree, and in this connection you are instructed that if you believe and find from the evidence that the defendants, Martha P. Aitken and Charles Aitken, or either of them, at the county of Jefferson, in the State of Missouri, at any time within three years next prior to the 26th day of August, 1911, in and upon the body of one Lilby Annie Aitken, a woman then and there being pregnant with a child, did then and there, unlawfully, wilfully and feloniously, make an assault, and that defendants, or either of them, did then and there, unlawfully, wilfully and feloniously, use and employ in and upon the body and womb of the said Lilby Annie Aitken any instrument or hard substance, and that the defendants, or either of them, did then and there, unlawfully, wilfully and feloniously, insert, thrust and force said instrument or hard substance into the private parts and womb of the said Lilby Annie Aitken, and did thereby then and there greatly wound the said Lilby Annie Aitken in and upon the body and womb of her, said Lilby Annie Aitken, with the felonious intent thereby, then and there, to procure, produce and promote a miscarriage or abortion of the then existing pregnancy of her, the said Lilby Annie Aitken, and that the same was not, then and there, necessary to preserve the life

of said pregnant woman, Lilby Annie Aitken, or that the same, namely, the use and employment of the instrument or hard substance as aforesaid, was not advised by a duly licensed physician to be necessary to preserve the life of said pregnant woman, Lilby Annie Aitken; and if the jury further believe and find from the evidence that, by the means, and in consequence of the unlawful, willful and felonious use and employment of said instrument or hard substance as aforesaid, in and upon the body and womb of the said Lilby Annie Aitken, by the defendants, or either of them, as aforesaid, with the felonious intent to destroy the foetus and child in the womb of the said Lilby Annie Aitken, then and there being, and thereby procure, produce and promote a miscarriage or abortion of the then existing pregnancy of her, the said Lilby Annie Aitken, she, the said Lilby Annie Aitken, then and there became mortally wounded and diseased of her womb and body, of which mortal wound and disease she, the said Lilby Annie Aitken, subsequently, on the 25th day of June, 1911, at the county of Jefferson, in the State of Missouri, did die, you will find the defendants, or either of them, guilty of manslaughter in the second degree, as charged in the information, and will assess the punishment of each of them at imprisonment in the penitentiary for a term of not less than three years nor more than five years.

"The words 'felonious' and 'feloniously' as used in these instructions mean wickedly and against the admonition of the law.

"The word 'willfully' as used in these instructions means intentionally, not accidentally.

"You are further instructed that you may find both of the defendants guilty, or you may find one of them guilty and the other not guilty, or you may find both of them not guilty."

It is urged with force and ability that this instruction is erroneous in that it tells the jury to assess the

punishment of *each* of the defendants in case *either* is found guilty. Here is the verdict of the jury:

"We, the jury, in the case of State of Missouri against Martha P. Aitken and Charles Aitken, find the defendants, Martha P. Aitken and Charley Aitken, guilty of manslaughter in the second degree, as charged in the information, and we assess the punishment of the defendant, Martha P. Aitken, at imprisonment in the penitentiary for a term of three years; and we assess the punishment of the defendant, Charles Aitken, at imprisonment in the penitentiary for a term of three years."

Inasmuch as both defendants were found guilty, no error can be predicated upon words in the instruction which only refer to a situation where only one is found guilty. That portion of the instruction complained of need not have been considered by the jury at all, in view of their finding that both were guilty. Aside from this the instruction was not misleading. We must read it all, and we must impute some fair degree of intelligence to the jury. The last paragraph tells the jury that they may find one guilty and acquit the other. If the jury should find only one guilty, can it be supposed for a moment that they would understand from this instruction that they were to also punish the one whom they should find not guilty? We apprehend that any sensible man would understand from this instruction that the expression, "assess the punishment of each," is to be applied to the one who is found guilty, if only one is guilty, and to each if both are guilty.

It may also be suggested, although the point is not touched upon on either side, that this instruction, according to its strict terms, permitted the jury to find both guilty, although they might believe that only one actually committed the crime. We apprehend that a jury would take a common sense view of the instruction, and render a verdict as they found the facts. It

would never occur to them to think that the court intended that they should find both guilty when they were satisfied that only one committed the crime.

The evidence showed both defendants as participants and equal in guilt, if either was guilty. The jury so found by express terms in their verdict. We are satisfied that the instruction, though faulty in construction, did not mislead the jury, and that its submission was not reversible error.

III. The court instructed on circumstantial evidence as follows:

"2. The jury are further instructed that it is not necessary to prove the guilt of defendants by the testimony of witnesses who may have seen the offense committed, if you find an offense has been committed, but their guilt may be shown by proof of facts and circumstances from which it may be reasonably and satisfactorily inferred.

"Evidence is of two kinds, direct and circumstantial. Direct evidence is when a witness testifies directly of his own knowledge of a main fact or facts to be proven. Circumstantial evidence is proof of certain facts and circumstances in a certain case from which the jury may infer other and connected facts which usually and reasonably follow, according to the common experience of mankind. Crime may be proven by circumstantial evidence as well as by direct testimony of eye witnesses. But the facts and circumstances in evidence should be consistent with each other and with the guilt of defendants, and inconsistent with any reasonable theory of the defendants' innocence."

The defendants requested the following instruction, which was refused:

"You are further instructed that it is not necessary to prove defendants guilty by the testimony of witnesses who may have seen the offense committed.

Guilt may be shown by proof of facts and circumstances from which it may be reasonably and satisfactorily inferred. In determining whether the defendants are guilty or not, you should take into consideration all the facts and circumstances in evidence, the acts and conduct of the defendants, and their motive, if any, for doing or not doing the acts charged as shown by the evidence, and if you find from all the facts and circumstances in evidence that there is no other reasonable conclusion than that they are guilty, you will so find, but to convict the defendants on circumstantial evidence alone, the circumstances proven must be consistent with their guilt and with each other, and must, taken together, point so conclusively to their guilt as to exclude every reasonable hypothesis of their innocence.''

It will be perceived that the only substantial difference is the clause in defendants' instruction referring to motive. Motive is a material consideration in a case of circumstantial evidence, and is a proper matter for argument before the jury. Its absence does not prove innocence; nor does the mere fact that it exists establish guilt. Motive is a circumstance for or against the defendant as the jury may find that it does not or does exist; and is to be weighed together with all other facts and circumstances in evidence. It does not follow from the fact that a circumstance is material that a jury must be instructed especially upon that circumstance. Nor does it follow that failure to instruct is error because it would not be error to instruct on the point.

We held in State v. David, 131 Mo. 380, that it was not error to instruct that if the jury believed defendant guilty they should so find, whether any motive was apparent or not. In that case we also held proper the instruction given on behalf of defendant that the failure to show motive was a circumstance favorable to defendant.

In State v. Foley, 144 Mo. 600, where the court gave an instruction similar to the one given for the State in the David case, we held it error to refuse the one requested by the defendant giving him the benefit of absence of motive. We held this on the theory that, the court having charged on the subject of motive from the standpoint of the State, it was unfair not to present to the jury the converse of the proposition. We held to the same effect in State v. Harris, 232 Mo. 317. But we have not held it to be error to fail to instruct at all on the question of motive.

In the case before us the court did not instruct on motive. It might have done so, and, if it had, then defendants' instruction, although inartificial, amounted to a request, and would have imposed upon the court the duty to frame a proper one on this point. It was not error to fail to instruct on motive, which is but one of all the circumstances to be considered by the jury, and does not require a special instruction.

In this case there was uncontradicted evidence showing motive. An instruction calling special attention to the subject could not have benefited the defendants, and for this reason also they ought not to complain. We hold that, under the circumstances of this case, the refusal to give the instruction requested by defendants was not error.

Finding no reversible error, we affirm the judgment. *Kennish* and *Brown, JJ.,* concur.